# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

SHARYL THOMPSON ATTKISSON,   )
*et al.*,   )
  )
      Plaintiffs,   )
  )
      vs.   )     Civil Action No. 1:17cv364
  )
ERIC HOLDER, *et al.*,   )
  )
      Defendants.   )
_____ )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED MOTION TO DISMISS

DANA J. BOENTE
UNITED STATES ATTORNEY

DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division

ANDREW S. HAN
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891/3790
Fax:      (703) 299-3983
Email: dennis.barghaan@usdoj.gov
       andrew.han@usdoj.gov

DATE: August 9, 2017     ATTORNEYS FOR DEFENDANTS
ERIC HOLDER, PATRICK DONAHOE, &
UNITED STATES OF AMERICA

# INTRODUCTION

In this action, plaintiffs seek to impose personal liability on a member of President Obama's Cabinet – former Attorney General of the United States Eric Holder – because of his alleged role in the development of policies that were (from plaintiffs' vantage point) hostile to the media. Based on his role as "the principal architect" of these policies, and the Executive Branch official with "ultimate authority over" the Department of Justice, plaintiffs maintain that General Holder is personally responsible for an alleged incursion into their personal computing devices. And more, plaintiffs also seek to impose personal liability on former Postmaster General of the United States James Donohoe simply because a privately-obtained forensic analysis reported that this incursion putatively utilized an IP address owned by the agency that he led – the United States Postal Service.

None of the myriad constitutional or statutory claims asserted within plaintiffs' two consolidated complaints can proceed. Taking plaintiffs' constitutional claims first, the Supreme Court's recent watershed decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), precludes this Court from expanding the implied constitutional cause of action initially created in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), into this new policy-related context. And in any event, General Holder and Postmaster General Donohoe are entitled to qualified immunity. Plaintiffs have simply failed to plead sufficient non-conclusory allegations to render these high-level officials' personal involvement in the technological incursion plausible.

Plaintiffs' statutory claims fare no better. The same pleading deficiencies that plague plaintiffs' constitutional claims similarly require dismissal of their statutory claims against General Holder and Postmaster General Donohoe. And either for reasons of sovereign immunity

or on the merits of their statutory claims, plaintiffs cannot hold the United States liable under any of the individual statutes that plaintiffs identify.

## FACTUAL BACKGROUND[1]

1.      Plaintiff Sharyl Attkisson ("Attkisson") is a former investigative reporter for CBS news. *Complaint*, ¶5.  In that capacity, Attkisson reported stories concerning incidents involving national security interests – "Fast and Furious" (in 2011), and the attack in Benghazi (in 2012). *Id.* ¶¶5, 14, 34.  After Attkisson's reports on "Fast and Furious" in 2011, plaintiffs began to "notice anomalies in numerous electronic devices at their home," including their "house alarming chirping daily at different times." *Id.* ¶23.  In 2012, after Attkisson reported on Benghazi, plaintiffs "began noticing an escalation of electronic problems at their personal residence." *Id.* ¶35.

        Plaintiffs aver that a privately-obtained "forensic computer analysis" revealed their personal devices "were targets of unauthorized surveillance efforts," *id.* ¶27; more specifically, that some unknown "intruders executed remote actions . . . on her computer and home electronic equipment," *id.* ¶42.  According to plaintiffs, "an individual with special expertise in computer forensics" examined their computers in January 2013 and reported that "the sources of the intrusion were state-supported" because of the sophisticated technology used.  *Id.* ¶47.  Plaintiffs further claim that "information recovered directly from [their] computers proved that remote communication with [their] system was executed via an IP address owned, controlled, and

---

[1] This action actually represents the consolidation of two separate civil actions (and thus two separate complaints) filed by plaintiffs, which the United States District Court for the District of Columbia ultimately consolidated:  *Attkisson v. Holder, et al.*, No. 1:15cv238 (D.D.C.); *Attkisson v. Holder*, No. 1:15cv1437 (D.D.C.).  Given the consolidation of the two actions, and consistent with the initial motion to dismiss filed in this action, all references to "*Complaint*" in the instant factual discussion is to the "Corrected" Complaint filed in the latter action.  *Attkisson*, No. 1:15cv1437 (D.D.C.) (Dkt. No. 4).

operated by the United States Postal [S]ervice ["USPS"], and *was not associated with any web server or website used by the USPS*." *Id.* ¶27 (emphasis added).  Nevertheless, plaintiffs confirm that their own expert noted that evidence of intrusion was wiped from their computers.  *Id.* ¶64.

2.      Despite numerous allegations to the effect that *someone* engaged in an intrusion of their computers, plaintiffs' complaint contains very little in the way of non-conclusory allegations to the effect that General Holder or Postmaster General Donahoe were personally involved in the surreptitious accessing of their personal electronic devices.  Recognizing the dearth of evidence involving Holder or Donahoe, Plaintiffs attempt to implicate both senior officials through completely collateral allegations that have nothing to do with furtive activities directed at plaintiffs.

In this respect, plaintiffs maintain that General Holder was personally involved in the incursion into their personal devices because he "had ultimate authority over" the Department of Justice, *id.* ¶8, was "the principal architect" of unstated policies that were – in plaintiffs' view – hostile to the press, and authorized the prosecution of those federal employees who provided national security information to media outlets without authority under the Espionage Act, *id.* ¶¶72(a)-(b), (h).  The only connection between General Holder and plaintiffs themselves is simply that General Holder was concerned about the national security information contained in Attkisson's reporting, and that he raised those concerns with the White House.  *Id.* ¶¶72(q)-(t).

The allegations concerning Postmaster General Donohoe's involvement in these events are barely existent at all.  In this respect, plaintiffs aver that USPS had publicly reported a working relationship with the FBI and DHS on domestic surveillance projects, *id.* ¶63, and that nearly sixteen years ago, USPS participated in a joint task force involving the FBI and DOJ, *id.* ¶72(ww).  And because Postmaster General Donohoe had "ultimate authority over" USPS, *id.*

¶¶9; 72(pp), that position of responsibility is ostensibly sufficient to give rise to significant personal liability for the incursion into plaintiffs' personal devices.

3.      Based on these allegations, plaintiffs raise a myriad of constitutional and statutory claims against General Holder and Postmaster General Donohoe, in their individual capacities, and the United States, seeking monetary relief.

Plaintiffs first seek to have this Court create an implied *Bivens* cause of action against General Holder and Postmaster General Donohoe in their individual capacities, maintaining that the incursion into their personal computing devices constituted a violation of the First Amendment's speech and press guarantees, and the Fourth Amendment's "unlawful search and seizure" prescription. *Id.* ¶¶98-101. Plaintiffs also present a series of statutory and common law claims against all of the defendants. On this score, plaintiffs seek relief pursuant to a series of statutes in which Congress has legislated on the subject of incursion into computer data and transmissions: (1) 18 U.S.C. §§ 2511 and 2520 (part of the Electronic Communications Privacy Act); (2) 18 U.S.C. §§ 2701 and 2707 (part of the Stored Communications Act); (3) 18 U.S.C. § 1030 (part of the Computer Fraud and Abuse Act); (4) 50 U.S.C. § 1810 (part of the Foreign Intelligence Surveillance Act); and (5) Virginia Code § 18.2-152.12 (part of the Virginia Computer Crimes Act). *Id.* ¶¶73-92. Plaintiffs finally seek relief pursuant to the Virginia common law tort of trespass. *Id.* ¶¶93-97.

## ARGUMENT

## I.      GENERAL STANDARDS

### A.      FEDERAL RULE 12(b)(1)

Federal Rule 12(b)(1) serves as the appropriate vehicle to challenge the court's subject matter jurisdiction in a particular matter. *See, e.g., Coulter v. United States*, 256 F. Supp. 2d

484, 486 n.3 (E.D. Va. 2003), *aff'd*, 90 Fed. Appx. 60 (4th Cir. 2004).  The plaintiff bears the

burden of establishing the court's subject matter jurisdiction, and although this Court may utilize

the allegations contained within the four corners of the plaintiff's complaint as *evidence* in

determining whether it possesses jurisdiction over a dispute, it may also consider other evidence

outside the pleadings if necessary.  *See Richmond, Fredericksburg, & Potomac R.R. Corp. v.*

*United States*, 945 F.2d 765, 768 (4th Cir. 1991); *Coulter*, 256 F. Supp. 2d at 486 n.3.

### B.    FEDERAL RULE 12(b)(6)

To the contrary, a motion pursuant to Federal Rule 12(b)(6) serves to test the legal

sufficiency of the plaintiff's complaint in relation to the factual averments he or she puts

forward.  Although a court must accept all well-pled allegations in adjudicating such a motion, it

need not credit allegations that are merely conclusory.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 675

(2009).  In *Iqbal*, the Supreme Court held as follows with respect to the proper standard of

review:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to "state a claim to relief that is plausible on its face."  A claim has
> factual plausibility when the plaintiff pleads factual content that allow the court to draw
> the reasonable inference that the defendant is liable for the misconduct alleged.

*Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Accordingly,

although (as before) a court is required to adjudge the factual averments contained within a

complaint against the substantive law governing the claim, now "where the well-pleaded *facts* do

not permit the court to infer more than the *mere possibility* of misconduct," the complaint fails.

*Id.* at 679 (emphasis added).

## II.    THIS COURT SHOULD DISMISS PLAINTIFFS' DISFAVORED & IMPLIED *BIVENS* CLAIMS

The instant memorandum will begin its substantive analysis with plaintiffs' constitutional

claims, which plaintiffs purport to bring *only* against General Holder and Postmaster General

Donohoe in their individual capacities.  *Complaint*, ¶¶98-101.  This Court should dismiss those claims for two independent reasons – (1) the Supreme Court has now held that courts should not imply a *Bivens* cause of action under the Constitution in a new context such as this whenever any "special factor" is present; and (2) General Holder and Postmaster General Donohoe are entitled to qualified immunity.

### A.   THIS COURT SHOULD NOT EXPAND *BIVENS* INTO THIS NEW CONTEXT

Because a *Bivens* action is a judicially-created remedy, the first question this Court must always confront is whether it should create a *Bivens* remedy for the particular context in which the alleged unconstitutional conduct arose.  For the last thirty years, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants."  *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *see also Lebron v. Rumsfeld*, 670 F.3d 540, 547 (4th Cir. 2012).  Indeed, as the Fourth Circuit previously explained, "[i]t is clear that expansion of a *Bivens*-based cause of action . . . is the exception, not the rule." *Cioca v. Rumsfeld*, 720 F.3d 505, 510 (4th Cir. 2013).  Accordingly, the Fourth Circuit has directed that whenever, as here, a party seeks to extend a *Bivens* remedy to a new context or new category of defendants, a court "must approach [that] invitation to imply a *Bivens* action here *with skepticism*."  *Lebron*, 670 F.3d at 548 (emphasis added).

All of this jurisprudential authority, however, was issued *before* the Supreme Court's watershed decision on this subject approximately one month ago in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).  As will be seen, although the Fourth Circuit previously mandated that new *Bivens* theories were to be met "with skepticism," in *Abbasi*, the Supreme Court went further, holding that courts lack the authority to expand the *Bivens* remedy substantially beyond those instances in which the Supreme Court has already recognized such an implied right of action.

1.      In *Abbasi*, plaintiffs – aliens detained in the wake of the September 11th attacks – brought *Bivens* actions against high-level federal officials, including the former Attorney General of the United States.  *Abbasi*, 137 S. Ct. at 1854-55.  Plaintiffs averred that these high-ranking officials developed policies concerning their detention that were subsequently applied to them in violation of their First, Fourth, and Fifth Amendment rights.  *See id.*  In no uncertain terms, the Supreme Court held that plaintiffs could not seek damages against these Executive Branch officials with respect to these putative detention policies through an implied and judicially-created *Bivens* cause of action.  *See id.* at 1865.  And in so holding, the *Abbasi* Court substantially limited those instances in which an implied *Bivens* remedy would be available.

The Supreme Court began by explaining, once again, that it had only approved of a cause of action brought against federal officials implied directly from the Constitution on three separate occasions, *see id.* at 1854-55 – in *Bivens* itself (which the *Abbasi* Court framed as "a claim against FBI agents for handcuffing a man in his own home without a warrant," *id.* at 1860), in *Davis v. Passman*, 442 U.S. 228 (1979) ("a claim against a Congressman for firing his female secretary," *Abbasi*, 137 S. Ct. at 1860), and in *Carlson v. Green*, 446 U.S. 14 (1980) ("a claim against prison officials for failure to treat an inmate's asthma," *Abbasi*, 137 S. Ct. at 1860). And, the Court continued, those decisions were issued during an "*ancien regime*" in which the judicial creation of an implied cause of action was deemed appropriate; in more modern times, however, the Court's jurisprudence has evolved to disfavor significantly such implied claims. *See id.* at 1855-56.  Indeed, the Court openly questioned whether those three *Bivens* decision "might have been different if they were decided today."  *Id.* at 1856.

The *Abbasi* Court held that courts going forward were to recognize that "separation-of-powers principles are or should be central to" whether to create an implied damages remedy akin

to *Bivens*, and that "most often," the answer to this inquiry will be that Congress – and not the courts – should be responsible for deciding whether to create a private right of action. *Id.* at 1857.  This is so because "[c]laims against federal officials often create substantial costs," including an "impact on government operations systemwide," especially where "the tort and monetary liability mechanisms of the legal system are [being] used to bring about the proper formulation and implementation of public policies." *Id.* at 1857-58.  Accordingly, the *Abbasi* Court held that "[i]n most instances" courts should generally defer to Congress concerning whether to extend a cause of action for damages in a given context. *Id.* at 1857.

The *Abbasi* Court then proceeded to apply these general principles, and in so doing, provided a new analytical framework for courts to follow.  Courts first must determine "whether a case presents a new *Bivens* context." *Id.* at 1859.  A case "presents a new context," the Court explained, whenever "the case is different in a meaningful way from previous *Bivens* cases decided by this Court" (*i.e.*, *Bivens*, *Davis*, and *Carlson*). *Id.*  Such "meaningful differences" included the following:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruption by the Judiciary into the functioning of other branches; or the presence of special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.  Nor need there be a wide gap between the Supreme Court's prior *Bivens* decisions and the case at hand; as the Court explained, a "meaningful" difference may still be "small, at least in practical terms," and thus, this part of the analysis "is easily satisfied." *Id.* at 1865.

Once a court concludes that a particular case concerns a context not addressed in one of the Supreme Court's three prior *Bivens* decisions (and thus is "new"), it must proceed to the second step of the analysis:  whether "special factors" demonstrate that the decision of whether

to create a wholesale damages remedy against federal officials in this new context should be left to the nation's Legislature.  In this respect, the *Abbasi* Court noted "that a *Bivens* action is not 'a proper vehicle'" for challenging the propriety of a policy issued by a federal agency or official, because, *inter alia*, "the discovery and litigation process would either border upon or directly implicate the discussion and deliberations that led to the formulation of the policy."  *Id.* at 1860-61 (quoting *Malesko*, 534 U.S. at 74).  The Court also noted that the claims presented in *Abbasi* "challenge[d] more than standard 'law enforcement operations,'" *id.* at 1861 (quoting *United States v. Verdugo-Urdiquez*, 494 U.S. 259, 273 (1990)), and that despite several opportunities to do so, Congress had elected not to extend a private right of action within this context, *see id.* at 1862.  As such, the *Abbasi* Court held, plaintiffs' implied *Bivens* cause of action could not "proceed."  *See id.* at 1863.

2.      The application of the *Abbasi* framework easily yields the identical result here; indeed, *Abbasi* bears much in common with the instant action.

*First*, there can be little doubt that this case presents a "new context" pursuant to the *Abbasi* Court's definition.  There are numerous "meaningful differences" between plaintiffs' proposed *Bivens* action against General Holder and Postmaster General Donohoe and the Supreme Court's decisions in *Bivens*, *Davis*, and *Carlson*.  At the very least, plaintiffs' instant claims – like those presented in *Abbasi* – "involve" high-ranking officials with the federal government (including a member of the President's Cabinet) and policy decisions putatively made by those high-ranking officials, implicate national security information and decision-making about that information, and rely upon a different constitutional provision than those at issue in the Supreme Court's prior decisions (*i.e.*, First Amendment) or the same constitutional provision (*i.e.*, Fourth Amendment) within a significantly-different factual setting than that

presented in those prior decisions.  Put simply, plaintiffs' claims "bear little resemblance to the three *Bivens* claims the Court has approved in the past."  *Id.* at 1860.

*Second*, an analysis of those "special factors" implicated by plaintiffs' claims yields the inescapable conclusion "that whether a damages action should be allowed is a decision for the Congress to make, not the courts."  *Id.*  Initially, as in *Abbasi*, plaintiffs' claims here seek to inculcate *Bivens* liability for policies issued by high-ranking federal officials such as General Holder and Postmaster General Donohoe.  On this score, plaintiffs' complaint explicitly provides – with respect to his involvement in the alleged unlawful actions here – that General Holder "was the principal architect" of policies hostile to media interests (including the prosecution of federal employees who leaked national security information to journalists), *Complaint*, ¶¶72(a)-(h), and that Postmaster General Donohoe was ultimately responsible for the USPS, which had a longstanding policy to partners with the FBI in efforts to combat terrorism, *id.* ¶72(ww).  Given the *Abbasi* court's admonition that implied *Bivens* remedies do not serve to challenge the legitimacy of federal policies – especially outside of the typical "law enforcement" context – this "special factor" alone requires rejection of plaintiff's *Bivens* claims.  This conclusion is only bolstered by the fact that the policies in question here, as well as Attkisson's reporting that is at the heart of this action, concern the dissemination of national security information.  *See Abbasi*, 137 S. Ct. at 1861-62.

Additionally, there can be little doubt that Congress has – at the very least – legislated in the underlying arena in which plaintiffs' claims arise; *i.e.*, unauthorized incursions into an individual's electronic devices and data.  Plaintiffs here identify no less than *four* individual federal statutes that, they maintain, represent congressional efforts to regulate in this context and run the gamut of potential electronic incursions.  *Complaint*, ¶¶73-92.  This constellation of

statutory provisions itself constitutes the type of "comprehensive remedial scheme" that the Supreme Court, even before *Abbasi*, held to preclude an expansion of the implied *Bivens* remedy.  *See Schweiker v. Chilicky*, 487 U.S. 412, 414 (1987).  And of course, as *Abbasi* makes clear, whether plaintiffs can actually recover monetary relief under these independent statutes is not of moment – if Congress has had the opportunity to create a remedy and has declined to do so, that "silence is telling."  *Abbasi*, 137 S. Ct. at 1862.

In the end, the Supreme Court's decision in *Abbasi* compels this Court to reject plaintiffs' attempt to proceed on implied *Bivens* claims against General Holder and Postmaster General Donohoe.

### B.     GENERAL HOLDER AND POSTMASTER GENERAL DONOHOE ARE ENTITLED TO QUALIFIED IMMUNITY

Even if this Court could somehow allow plaintiffs to present implied *Bivens* claims here, both General Holder and Postmaster General Donohoe would be entitled to qualified immunity.

Recognizing the significant ill-effects caused by its recognition of an individual-capacity damages remedy against federal officials engaged in unconstitutional conduct, however, the Supreme Court has repeatedly held that such officials enjoy qualified immunity from suit unless their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996).  The Court has articulated the rationale behind the qualified immunity doctrine on several occasions, but perhaps best in *Anderson v. Creighton*, 483 U.S. 635 (1987):

> [P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liabilities and harassing litigation will unduly inhibit officials in the discharge of their duties.

*Id.* at 638; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).  In other words, the mere specter of damages could cause officials to be primarily concerned with avoiding personal

liability, and not the swift discharge of their duties.  *See Doe v. Broderick*, 225 F.3d 440, 452 (4th Cir. 2000).

Determinations into whether a particular officer enjoys qualified immunity are generally governed by a two-pronged analysis.  First, one asks whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional violation.  *See Saucier v. Katz*, 533 U.S. 194, 199 (2001); *Pike v. Osbourne*, 301 F.3d 182, 184 (4th Cir. 2002).  Only if one answers this initial inquiry in the affirmative must one then "determine whether the contours of the right were clearly established such that a reasonable official would understand that what he [was] doing violated that right."  *Pike*, 301 F.3d at 185.  Previously, courts were required to address questions of qualified immunity through a seriatim application of this two-part test; *i.e.*, a court was always required to first determine whether a constitutional violation occurred regardless of whether that violation was at all clearly-established.  *See Saucier*, 533 U.S. at 199.  But the Supreme Court has now held that a court "may exercise [its] sound discretion" to dismiss an action on clearly-established grounds without opining on whether the conduct actually violated the Constitution. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

An integral part of this doctrine is that an individual capacity defendant is entitled to qualified immunity unless they had *personal* involvement in the alleged unconstitutional conduct at issue.  *See Iqbal*, 556 U.S. at 676.  One cannot overcome qualified immunity through application of the *respondeat superior* theory; or, as plaintiffs allege here, because General Holder and Postmaster General Donohoe were "ultimately responsible" for DOJ and USPS, respectively, *Complaint*, ¶¶8-9.  To the contrary, as the Supreme Court held in *Iqbal*, a plaintiff must plead sufficient *non-conclusory* allegations to create a plausible inference that "each Government-official defendant, through the official's own individual actions, has violated the

Constitution." *Iqbal*, 556 U.S. at 676; *see also Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir.

2014).  As other courts have recognized, in order to surpass the *Iqbal* pleading hurdle, "[i]t is

important that plaintiffs make clear exactly *who* is alleged to have done *what to whom*," *Pahls v.

Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013), and accordingly, complaints that "lack[] factual

particularity regarding personal involvement and conduct of the *individual*" federal officials

must be dismissed, *Fennell v. Gregory*, 414 Fed. Appx. 32, 35 (9th Cir. 2011).

Plaintiffs' instant complaint falls well short of the plausibility mark; indeed, that

complaint bears much in common with the complaint that the Supreme Court found deficient in

*Iqbal* itself.  In that case – a companion to that which would ultimately become *Abbasi* – the

Supreme Court confronted a *Bivens* action brought against the former Attorney General of the

United States alleging that he was the "principal architect" of a policy concerning the detention

conditions to which aliens would be subjected, and that he "'knew of, condoned, and willfully

and maliciously agreed to subject' [plaintiff] to harsh conditions of confinement 'as a matter of

policy, solely on account of [his] religion, race, and/or national origin and for no legitimate

penological interest.'" *Iqbal*, 556 U.S. at 669.  The Supreme Court held that both of these

allegations were conclusory in nature – because they represented nothing more than "a formulaic

recitation of the elements of a cause of action" – and thus insufficient to render plausible the

Attorney General's personal involvement.  *Id.* at 668.  In simple terms, the Court held that the

*Iqbal* complaint left one only to speculate regarding whether the Attorney General was

personally involved in the actual unconstitutional conduct.

As suggested above, plaintiffs' complaint here is rather similar to that which the *Iqbal*

Court rejected.  With respect to General Holder, the complaint merely avers that he promulgated

policies that were hostile to media interests, and that he was the "principal architect" of an

undefined and unexplained policy that somehow "required or encouraged the violation of plaintiffs' rights." *Complaint*, ¶¶72(a)-(g). These averments, however, are nothing more than the exact type of legally "formulaic" terms and phrases that the Supreme Court held insufficient in *Iqbal*. Nor does the remainder of the complaint make up for this deficiency, as it simply describes the purported incursion into plaintiffs' computer devices in impersonal terms, such as that these incursions were accomplished by unnamed "government agents," and that the IP address of a "government agency" was utilized. *Complaint*, ¶¶47-49; 62. None of these generic allegations nudge plaintiffs' claim – which requires a demonstration that *General Holder* was actually and personally involved in the illegal incursion – "across the line" from speculative to plausible. *Twombly*, 550 U.S. at 570.

Plaintiffs' allegations concerning Postmaster General Donohoe are even more paltry. In this respect, in addition to similar conclusory allegations, plaintiffs merely allege that Postmaster General Donohoe was ultimately responsible for USPS's IP addresses, and that USPS components had partnered with other law enforcement entities in combatting terrorism, a partnership that was ostensibly in place nearly *fifteen years before* the alleged incursions in this case. *Complaint*, ¶¶63, 72(I); 72(ww). Nothing in plaintiffs' complaint even *suggests*, let alone plausibly avers, that Postmaster General Donohoe particularly authorized the FBI (or any other government agency) to utilize USPS IP addresses as a part of an unlawful incursion into plaintiffs' computer devices. Plaintiffs' *Bivens* claims against Postmaster General Donohoe must therefore fail.

## III.   PLAINTIFF'S STATUTORY CLAIMS SHOULD BE DISMISSED

Plaintiffs next bring several statutory claims against the United States, as well as General Holder and Postmaster General Donohoe in their individual capacity. The instant memorandum

will proceed to examine each of these statutory provisions in turn, separating the analysis

between plaintiffs' claims against the United States, on the one hand, and the individual capacity

defendants, on the other.  Before proceeding to that discussion, however, three threshold issues

are worthy of note.

*First*, plaintiffs' complaint avers that their instant action is "brought pursuant to" the

Federal Tort Claims Act ("FTCA"), *Complaint*, ¶2, but do not actually identify any of their

causes of action as having been brought pursuant to the FTCA; *i.e.*, each of plaintiffs' statutory

claims is clearly and unequivocally brought pursuant to a particular federal or state statute.  *Cf.*

*Harper v. San Diego Transit Corp.*, 764 F.2d 663, 667 (9th Cir. 1985) (holding that "plaintiff is

generally free to be the master of his own complaint").  Nevertheless, even if plaintiffs sought to

present each of these statutory claims *through* the FTCA, those claims would be subject to

dismissal.

The FTCA only grants a limited waiver of sovereign immunity for "tort claims against

the United States," *see Howard v United States*, 949 F. Supp. 2d 54, 56 (D.D.C. 2013), *aff'd*,

2014 WL 4628254 (D.C. Cir. July 14, 2014), "under circumstances where the United States, if a

private person, would be liable to the claimant in accordance with the law of the place where the

act or omission occurred." 28 U.S.C. § 1346(b)(1) (2016).  And as such, the FTCA generally

only provides a waiver of sovereign immunity when the claimant alleges that the federal official

violated *state tort* law.  *See United States v. Agronics Inc.*, 164 F.3d 1343, 1346 (10th Cir. 1999)

("[T]he FTCA's waiver of sovereign immunity is limited to conduct for which a private person

could be held liable under state tort law . . . ."); *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d

1151, 1157 (D.C. Cir. 1985) ("[T]he FTCA, by its terms, does not create new causes of action;

rather, it makes the United States liable in accordance with applicable local tort law.").  When a

plaintiff alleges that the United States is liable because its employees simply violated the provisions of a *federal statute*, there is no applicable waiver of sovereign immunity under the FTCA. *See Art Metal-U.S.A., Inc.,* 753 F.2d at 1157-58 ("We begin our analysis with the well-established principle that the violation of a federal statute or regulation by government officials does not of itself create a cause of action under the FTCA.").

The same can be said of plaintiffs' sole state statutory claim pursuant to the Virginia Computer Crime Act ("VCCA"). Absent a *congressional* waiver of sovereign immunity, the United States is not subject to liability under state statutes which are penal in nature, as the Supremacy Clause precludes such regulation. *See Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996). Plaintiffs' VCCA claim in this case is analogous to those at issue in *Blackburn*. In *Blackburn*, an individual was injured after he dove off of a bridge in Yosemite National Park, and brought a FTCA claim against the United States premised, in part, on the National Park Service's alleged failure to comply with a California penal statute in maintaining the bridge. *Id.* at 1428, 1435. The Ninth Circuit rejected the diver's claims and held this was not a legitimate basis for a tort claim against the government. *Id.* at 1435-37. Similarly, the VCCA is unquestionably "a criminal statute" even though it "grants civil recourse to a party aggrieved." *S.R. v. Inova Healthcare Servs.*, 49 Va. Cir. 119, 129 (1999).

*Second,* as stated in greater detail below, the United States argues that a number of the particular federal statutory provisions that plaintiffs identify do not contain the type of explicit waiver of sovereign immunity necessary to subject the United States to suit. Consistent with its obligation of candor, however, the United States recognizes the existence of 18 U.S.C. § 2712, which is technically a part of the Stored Communications Act, and provides as follows:

> Any person who is aggrieved by any willful violation of this chapter or of chapter 119 of this title[2] or of sections 106(a), 305(a), or 405(a) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.) may commence an action in United States District Court against the United States to recover money damages.

18 U.S.C. § 2712(a).  Although this statutory provision states that "an action against the United States *under this subsection* shall be the exclusive remedy against the United States for any claims within the purview of this section," *id.* § 2712(e) (emphasis added), plaintiffs do not cite § 2712 within their complaint.  As such, the United States has addressed the particular statutory provisions that plaintiffs' complaint does identify.

*Third*, it bears mentioning that the same principles of qualified immunity discussed above with respect to constitutional claims apply equally to these statutory claims.  *See Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (holding that government employees are entitled to qualified immunity unless they "violated clearly-established *statutory* or constitutional rights of which a reasonable person would have known" (emphasis added)).

## A.   ELECTRONIC COMMUNICATIONS PRIVACY ACT (ECPA) – 18 U.S.C. §§ 2511 & 2520

Plaintiffs first maintain that they are entitled to relief pursuant to 18 U.S.C. §§ 2511 and 2520, which are provisions within the Electronic Communications Privacy Act ("ECPA").  The ECPA is primarily a criminal statute, *see* 18 U.S.C. § 2511, but § 2520 – the provision specifically identified by plaintiffs here – also authorizes a civil cause of action under certain particularized circumstances.

### 1.   United States

Section 2520(a) provides as follows:

> Except as provided in section 2511(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter

---

[2] "Chapter 119" of Title 18 represents what plaintiffs have termed the Electronic Communications Privacy Act.

> [Chapter 119, Title 18 U.S.C.] may in a civil action recover from the person or entity, ***other than the United States***, which engaged in that violation such relief as may be appropriate. 18 U.S.C. § 2520(a) (emphasis added).

18 U.S.C. § 2520 (emphasis added).  Based on this explicit language, courts have repeatedly held that § 2520 does not provide the necessary explicit waiver of sovereign immunity necessary to subject the United States to suit.  *See, e.g.*, *Thomas v. Seth*, 317 Fed. Appx. 279, 282 (3d Cir. 2009); *Barani v. Dep't of Defense*, 2012 WL 1507208, at *1 (S.D.N.Y. Apr. 26, 2012), *aff'd*, 518 Fed. Appx. 48 (2d Cir. 2013).  And as such, this Court lacks subject-matter jurisdiction over plaintiffs' claim against the United States, and the same should be dismissed pursuant to Federal Rule 12(b)(1).

### 2.    General Holder & Postmaster General Donohoe

To the extent that plaintiffs also seek to present claims against General Holder and Postmaster General Donahoe in their individual capacities pursuant to this statutory provision, those claims do not state a plausible claim for relief, and should be dismissed pursuant to Federal Rule 12(b)(6).  This is so – in pertinent part – because of the limitations on the conduct that can give rise to civil liability under the statutory provision.  Pursuant to § 2511, "any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept any wire, oral, or electronic communication" violates the ECPA.  18 U.S.C. § 2511(1)(a).  And although § 2520 – which establishes a civil cause of action – previously parroted § 2511, Congress amended § 2520 thirty years ago to delete the "procured" language from the conduct that can give rise to a civil cause of action.  *Id.* § 2520 (providing that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity . . . which engaged in that violation.").

As the Fourth Circuit has held with respect to the ECPA itself, "[w]hen the wording of an amended statute differs in substance from the wording of the statute prior to amendment, we can only conclude that Congress intended the amended statute to have a different meaning." *Nalley v. Nalley*, 53 F.3d 649, 652 (4th Cir. 1995). And as such, courts have held that one cannot assert a civil action against an individual merely for procuring *others* to intercept communications in violation of § 2511; rather, one must establish that the individual *actually* performed the interception in question. *See Buckingham v. Gailor*, 2001 WL 34036325, at *6 (D. Md. Mar. 27, 2001), *aff'd*, 20 Fed. Appx. 243 (4th Cir. 2001); *see also Peavy v. WFAA–TV*, Inc., 221 F.3d 158, 169 (5th Cir. 2000); *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 24 (D.D.C. 2012) (holding that § 2520 "limits civil liability to interception, disclosure, and use"). At the very least, the existence of these decisions require a finding that General Holder and Postmaster General Donohoe are entitled to qualified immunity.

To be sure, for the reasons stated above, this statutory distinction is meaningless here, as plaintiffs' complaint is devoid of allegations that render plausible the conclusion that either General Holder or Postmaster General Donohoe had any involvement in the alleged incursion into plaintiffs' personal computer systems – including "procuring" another to do so. *See supra* Part II.B. But even if this Court were somehow to disagree with that position, nothing in plaintiffs' Complaint – save potentially conclusory allegations that this Court must disregard, *see Iqbal*, 556 U.S. at 678 – alleges that either high-level official personally and actually "intercept[ed], disclose[d] or use[d]" plaintiffs' communications. As such, this Court should dismiss plaintiff's § 2520 claim (Count I) against the individual capacity defendants pursuant to Federal Rule 12(b)(6).

### B.   STORED COMMUNICATIONS ACT – 18 U.S.C. §§ 2701 and 2707

Plaintiffs next maintain that they are entitled to relief pursuant to 18 U.S.C. §§ 2701 and

2707, which are provisions within the Stored Communications Act ("SCA").  Like the ECPA,[3]

the SCA is primarily a criminal statute, *see* 18 U.S.C. § 2701, but § 2707 – the provision

specifically identified by plaintiffs here – also authorizes a civil cause of action under certain

particularized circumstances.

### 1.   United States

a.   With respect to the United States, § 2707 – the particular statute pursuant to which

plaintiffs seek relief – contains much the same language as does its ECPA counterpart:

> any provider of electronic communication service, subscriber, or other person aggrieved
> by any violation of this chapter in which the conduct constituting the violation is engaged
> in with a knowing or intentional state of mind may, in a civil action, recover from the
> person or entity, **other than the United States**, which engaged in that violation such
> relief as may be appropriate.

18 U.S.C. § 2707(a) (emphasis added).  This Court therefore lacks subject-matter jurisdiction

over plaintiff's § 2707 claim.

b.   In addition, in order to state a claim under the SCA, plaintiffs must plausibly allege that

someone "intentionally accesse[d] without authorization a *facility* through which an electronic

communications service is provided."  18 U.S.C. § 2701(a)(1) (emphasis added).  And although

the SCA does not define the term "facility," it does define the term "electronic communication

service," which is "any service which provides to users thereof the ability to send or receive wire

or electronic communications."  *In re Google Inc. Cookie Placement Consumer Privacy Litig.*,

806 F.3d 125, 145-48 (3d Cir. 2015) (indicating that "facility," while undefined in the SCA, is

---

[3]As one jurist has explained, the general difference between the ECPA and the SCA is
that whereas the ECPA concerns "real-time" interception of electronic transmission, the SCA
concerns an interception of "stored" data.  *See Global Policy Partners, LLC v. Yessin*, 686 F.
Supp. 2d 631, 637 (E.D. Va. 2009).

directed at third party service providers).  The Third Circuit in *Google* explained that the definition "describes network service providers"; as such, "[c]ourts have interpreted the statute to apply to providers of a communication service such as telephone companies, [i]nternet or e-mail service providers, and bulletin board services." *Id.* at 146 (internal citation omitted).  And based on this definition, an "individual's personal computing device is not a 'facility through which an electronic communications service is provided.'" *Id.* (internal citation omitted); *see also United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1057-58 (N.D. Cal. 2012) (holding that "an individual's personal computer" is not a "facility" within meaning of the SCA).

Plaintiffs' complaint does not allege that any federal employee or official improperly accessed a "**facility** through which an electronic communication service is provided," as the courts have construed that statutory language.  Plaintiffs aver that their laptop, "a family Apple desktop," "house alarm," "phone line," and "television" experienced problems due to unauthorized electronic intrusion.  *Complaint*, ¶¶23, 32, 37, 40, 46, 50.  Because these personal devices are not "facilities" under § 2701(a), plaintiffs § 2707 claim should be dismissed.

## 2.   General Holder & Postmaster General Donahoe

In much the same manner as above, plaintiffs have not pled a plausible claim under § 2707 against General Holder or Postmaster General Donohoe in their individual capacities. Once again, plaintiffs' complaint is devoid of any non-conclusory allegation that would render plausible the conclusion that these two high-level officials were at all involved in any purported incursion into plaintiffs' computer systems.  But even were this Court to disagree with this conclusion, there is certainly no allegation to the effect that these two individuals personally accessed a "facility" for purposes of the SCA, and General Holder and Postmaster General

Donohoe are entitled to qualified immunity. Accordingly, this Court should dismiss plaintiffs' § 2707 claim pursuant to Federal Rule 12(b)(6) for failure to state a plausible claim.

C.     **COMPUTER FRAUD AND ABUSE ACT – 18 U.S.C. § 1030**

Plaintiffs' next seek relief specifically pursuant to 18 U.S.C. § 1030, more formally known as the Computer Fraud and Abuse Act ("CFAA"). Plaintiffs' claim in this regard is pled in a purely formulaic fashion, alleging that "[d]efendants, individually and in concert, intentionally accessed the Plaintiffs' computers and thereby obtained information from a protected computer, to wit Ms. Attkisson's computers used for her work as an investigative journalist for a national news agency" in violation of the CFAA, 18 U.S.C. § 1030. *Complaint*, ¶¶82-85. On this score, the complaint fails to indicate precisely which subsection(s) of § 1030 "Defendants" have allegedly violated, which is particularly difficult given that § 1030 contains at least five different provisions that prohibit a variety of conduct. *See* 18 U.S.C. §§ 1030(a)(1)-(5). This failure alone warrants dismissal. *See Twombly*, 550 U.S. at 555 (holding that a complaint must include "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action"). Indeed, this lack of specificity precludes this Court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

1.     **United States**

The statutory provision cited by plaintiffs provides for a civil cause of action as follows:

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subcl[au]ses [5] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.

*Id.* § 1030(g).  As the text of this provision reveals, there is simply no explicit waiver of the United States's sovereign immunity, which precludes this Court from entertaining any suit against the United States pursuant to the same.  *See Golden and Zimmerman, L.L.C. v. Domenech*, 599 F. Supp. 2d 702, 708 (E.D. Va. 2009) ("A suit against the United States is barred by sovereign immunity, unless plaintiffs can point to a specific and explicit waiver of such immunity."), *aff'd*, 599 F.3d 426 (4th Cir. 2010); *see also In re Perry*, 882 F.2d 534, 544 (1st Cir. 1989) ("To work abrogation of federal sovereign immunity, however, the legislative intent must be so clear and explicit as to brook no reasonable doubt.").

### 2.      General Holder and Postmaster General Donahoe

As with the previous counts of their complaint, there are simply no non-conclusory allegations within the four corners of plaintiffs' complaint that would render plausible the conclusion that either General Holder or Postmaster General Donohoe had any involvement in actually accessing plaintiffs' personal computing devices.  For this reason alone, plaintiffs' CFAA claim against the individual capacity defendants must be dismissed for failure to state a plausible claim.

### D.      FOREIGN INTELLIGENCE SURVEILLANCE ACT – 50 U.S.C. § 1810

Plaintiffs next assert a cause of action under 50 U.S.C. § 1810, which is a part of the Foreign Intelligence Surveillance Act ("FISA").  This statutory provision specifically provides as follows:

> An aggrieved person . . .  who has been subjected to an electronic surveillance . . . in violation of section 1809 of this title [Title 50, U.S.C.] shall have a cause of action against any person who committed such violation and shall be entitled to recover . . . actual [and] punitive damages [and] reasonable attorney's fees and other . . . costs . . .

50 U.S.C. § 1810 (emphasis added).

1.      **United States**

Much like plaintiffs' claim against the United States under the CFAA, § 1810 contains no explicit waiver of the United States's sovereign immunity; *i.e.*, the provision provides an aggrieved person a cause of action for damages "against any person" who committed a violation of 50 U.S.C. § 1809, and does not expressly state that such an aggrieved person shall have a cause of action against the United States.  It is thus well-established that the United States has not waived sovereign immunity under 50 U.S.C. § 1810.  *See Al–Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 852 (9th Cir. 2012) (holding that 50 U.S.C. § 1810 does not waive sovereign immunity against the United States for damages).  Indeed, Congress "carefully and explicitly" waived sovereign immunity with respect to only certain sections of the FISA, § 1810 was not included.  *See id.*  Plaintiffs' § 1810 claim against the United States is barred for want of subject matter jurisdiction.

2.      **General Holder and Postmaster General Donahoe**

As mentioned above, § 1810 provides for civil recovery only if one violates § 1809.  *See* 50 U.S.C. §1810.  To establish a violation of § 1809, "an aggrieved person" must demonstrate two prohibited activities:  (1) that the defendant in question engaged in electronic surveillance under color of law without proper authorization; and (2) defendants "disclose[d] or use[d] information obtained under color of law by electronic surveillance." *See* 50 U.S.C. § 1809(a).  Plaintiffs' complaint fails to demonstrate either of these two requirements in a plausible fashion.

At the outset, as explained repeatedly above, plaintiffs' complaint does not plausibly allege that either of these high-level officials had any role whatsoever in the putative incursion into their personal computing devices – let alone "actually" engaging in the incursion themselves.  Nor do the actual allegations found in plaintiffs' articulation of this particular claim

provide them with any assistance.  In the section of their complaint devoted to their § 1810

claim, plaintiffs allege – in passive voice – that they "*were* the target of electronic surveillance

and/or their communications *were* subject to electronic surveillance at the hands or direction of

the Defendants." *Id.* ¶87 (emphasis added).  As stated above, the Supreme Court has

unequivocally held that this type of "formulaic allegation," which does nothing more than recite

the elements of the cause of action in question, cannot be credited in the plausibility analysis.

*See Iqbal*, 556 U.S. at 662 (observing that "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice"); *see also Society Without a

Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011).

In addition, plaintiffs do not allege – let alone plausibly – that either of these officials

"disclose[d] or use[d] information obtained under color of law by electronic surveillance."

According to plaintiffs, the alleged intruder(s) – whoever they might have been – had "[a]ccess

to emails, personal files, Internet browsing, passwords, execution of programs, financial records,

[and] photographs of [Plaintiffs]," *Complaint* ¶27, there are no allegations to the effect that

Holder or Donahoe (assuming that they actually engaged in the intrusion) disclosed or used these

types of information.  Without more, plaintiffs have not plausibly alleged a violation of § 1809,

and thus, by Holder or Donahoe (or even by the United States), and the same must be dismissed

pursuant to Federal Rule 12(b)(6).

### E.   VIRGINIA COMPUTER CRIMES ACT – VIRGINIA CODE § 18.2-152.12

Plaintiffs also present a claim pursuant to a specific provision within a *state* criminal

statute – the Virginia Computer Crimes Act ("VCCA").  As a general matter, the VCCA

precludes a series of activities, including the use of a computer "to make . . . an unauthorized

copy" of "printed or electronic form of computer data." VA. CODE ANN. § 18.2-152.4(a)(6).  The

particular provision on which plaintiffs explicitly-premise their claim provides for a civil remedy for certain violations of the substantive provisions of the VCCA.  *See id.* § 18.2-152.12.

### 1.      United States

To the extent that plaintiffs intend to seek redress under the VCCA as a standalone claim, there can be little doubt that this Court lacks subject matter jurisdiction over such a claim.  It is well-settled that "*only* Congress . . . can waive the sovereign immunity of the United States." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jacks*, 960 F.2d 911, 913 (10th Cir. 1992); *see also Southern Rehab. Grp. v. Secretary*, 732 F.3d 670, 676 (6th Cir. 2013).  *A fortiori*, because the Virginia General Assembly most certainly cannot waive the United States's sovereign immunity from suit, this Court is without jurisdiction to consider plaintiffs' claim against the United States under the VCCA.

### 2.      General Holder and Postmaster General Donohoe

And to the extent that plaintiffs seek to assert claims against both General Holder and Postmaster General Donahoe in their individual capacities pursuant to the VCCA, such a claim would similarly be subject to dismissal.  In this respect, federal statute provides that the exclusive remedy for any "act or omission" on the part of federal officials within the scope of their employment is the FTCA, *see* 28 U.S.C. § 2679(a), and the only exceptions to this general rule are for constitutional and *federal* statutory claims, *see id.* § 2679(b).  Because plaintiffs in this specific regard are presenting a claim under a *state* statute, and clearly concede that the alleged actions of General Holder and Postmaster General Donahoe here – whatever they may be – were taken "within the course and scope of their employment with [] Defendant United States of America," *Complaint*, ¶11, plaintiffs cannot proceed against these individual capacity

defendants.  And in any event, there still remains the lack of any non-conclusory allegations that would render plausible the conclusion that of these high-level officials had any personal involvement in the type of electronic incursion that is necessary to demonstrate liability under the VCCA.

### F.    COMMON LAW TRESPASS

Plaintiffs also present a tort claim for trespass under the common law of Virginia.

### 1.    United States

Plaintiffs can cite no authority for the proposition that this Court would possess jurisdiction over an independent Virginia common law tort claim against the United States.  To be sure, however, a state common law tort claim is – at least as a general matter – properly presented against the United States under the FTCA.

In any event, in order to state a claim for trespass, plaintiff must allege an "unauthorized entry onto property which results in interference with the property owner's possessory interest." *Cooper v. Horn*, 448 S.E. 2d 403, 406 (Va. 1994).  Plaintiffs must also allege and prove that the invasion "interfered with the right of exclusive possession of the land and was a direct result of some act committed by the defendant."  *Id.*  Plaintiffs' allegations fail to establish plausibly the requisite elements of a trespass claim.  To be clear, plaintiffs do not aver that any federal employee "trespassed" on their land in Leesburg; at best, plaintiffs allege certain unidentified individuals purportedly invaded their property by engaging in electronic surveillance.  The only alleged "incursion" to plaintiffs' land that is alleged in this complaint occurred through telecommunications workers who were seeking – at plaintiffs' request – to diagnose the strange issues occurring with their personal electronic request, *Complaint*, ¶23, and employees of the DOJ's Office of Inspector General – who similarly arrived at plaintiffs' request, *id.* ¶ 61.  This is

simply not a trespass.  *See Pearson v. Canada Contracting Co.*, 349 S.E. 2d 106, 110 (Va. 1986) (holding that "an invitee is one who enters pursuant to the express or implied invitation of the owner or occupier other than for a social purpose or for his own convenience").

### 2.      **General Holder and Postmaster General Donohoe**

To the extent that plaintiffs seek to present claims against General Holder and Postmaster General Donohoe, in their individual capacities, for Virginia common law trespass, their claims fail for the same reasons as stated above with respect to the VCCA.  *See supra* Part III.E.2.

### **CONCLUSION**

For the foregoing reasons, this Court should grant defendants' motion to dismiss.

///

///

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:        _____/s/_____
           DENNIS C. BARGHAAN, JR.
           Deputy Chief, Civil Division

           ANDREW S. HAN
           Assistant U.S. Attorney
           2100 Jamieson Avenue
           Alexandria, Virginia 22314
           Telephone: (703) 299-3891
           Fax:        (703) 299-3983
           Email: dennis.barghaan@usdoj.gov
                      andrew.han@usdoj.gov

DATE: August 9, 2017          ATTORNEYS FOR ATTORNEYS FOR
                              DEFENDANTS ERIC HOLDER, PATRICK
                              DONAHOE, & UNITED STATES OF AMERICA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a true and correct copy of the same to the following:

David W. Thomas
MichieHamlett
500 Court Square, Suite 300
P.O. Box 298
Charlottesville, Virginia  22902
Email: dthomas@michiehamlett.com

Date: August 9, 2017

_____/s/_____
DENNIS C. BARGHAAN, JR.
Deputy Chief, Civil Division
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:       (703) 299-3983
Email:  dennis.barghaan@usdoj.gov

ATTORNEYS FOR DEFENDANTS
ERIC HOLDER, PATRICK DONAHOE, &
UNITED STATES OF AMERICA